HORACE K. POPE, JR., EMPLOYEE, Plaintiff, Appellee,
v.
JOHNS MANVILLE, EMPLOYER, ST. PAUL TRAVELERS INDEMNITY COMPANY, CARRIER-DEFENDANT, Defendants-Appellants.
No. COA09-281.
Court of Appeals of North Carolina.
Filed: January 19, 2010.
This case not for publication
Wallace and Graham, P.A., BY Michael B. Pross, for Plaintiff-Appellee.
Hedrick, Gardner, Kincheloe & Garofalo, L.L.P., by Deepa P. Tungare and Jeffrey A. Kadis, for Defendant-Appellant.
ERVIN, Judge.
Johns Manville and Travelers Indemnity Company (collectively, Defendants) appeal from an Opinion and Award of the North Carolina Industrial Commission entered 7 November 2008 concluding that Horace Pope (Plaintiff) was exposed to asbestos during his employment with Defendants; that Plaintiff had contracted asbestosis; that Plaintiff is disabled; and that Plaintiff should be awarded total disability benefits in the amount of $399.06 per week, medical expenses, and reasonable attorneys' fees. After careful consideration of the record in light of the applicable law, we affirm the Commission's decision.

I. Factual Background
Plaintiff, who was 80 years old at the time of the Commission's decision, worked from 1 January 1949 to 1 January 1950 and from 1 August 1952 to 31 August 1968 at a Johns Manville manufacturing plant located in Marshville, North Carolina. The facility was initially owned by Union Asbestos and Rubber Company, but was purchased by Johns Manville in 1962. At the Marshville facility, raw asbestos fibers were mixed with either cotton or rayon to form asbestos yarn, which was woven into cloth or tape.
In the course of the manufacturing process, raw asbestos arrived at the facility in fifty-pound bags, which were taken to a preparation room and opened. In essence, cotton fiber was put on the preparation room floor, and then bags of raw asbestos fibers were dumped onto the cotton.[1] At that point, the asbestos was mixed with either cotton or rayon by hand as part of a blending process that created "a lot of dust" in the air. During a typical shift, the employees would use 30 fifty-pound bags of asbestos. The employees' clothes would often be covered with dust from the asbestos fiber mixture.
The mixture was then taken to the carding room in a wooden box, where the fibers would be pulled into alignment. Workers picked up the fibers "by armfuls" in the carding room and loaded them into the back of the carding machine. The carding machines consisted of several rollers that pulled the asbestos fiber mixture into long strands. The use of different-sized rollers turning at varying speeds in the carding machines resulted in the creation of a lot of dust. A dust system on the carding machines moved the air in the plant without removing all of the dust. The carding process created a large amount of dust. Plaintiff described the resulting dust levels as similar to "the worst fog you've ever drove in or a snow storm, almost." After spending time in the carding room, the employees' clothes would be covered with dust and one could not identify a person at the opposite end of the room, which was 75 feet away.
After the completion of the carding process, the asbestos mixture was taken to the spinning department and spun into thin yarn. The spinning process involved the use of high speed spindles to twist the carded product into a thread, an activity that created more dust. "[D]ust would just fly off of that yarn all the time" in the spinning department due to the speed at which the spindles turned.
From the spinning department, the thin yarn was taken to the spooling department, where the thin yard was placed on larger spools. The spooling process involved a series of spindles and spools that turned at high speeds and threw off more dust. The dust levels in the spooling department caused the area to appear continuously foggy.
After leaving the spooling department, the larger spools were taken to the twisting department, where up to six or seven thin threads would be twisted together to form a larger thread or yarn. The twisting process created a lot of dust that came from the fiber.
Finally, the yarn was taken to the weaving department and used to make fabric. In the weaving room, the thread would be used in a loom, in which a number of threads would be placed next to each other. A shuttle carrying another thread would be run across these threads in order to weave them all together. The weaving process created a lot of dust as well.
All of these functions were performed in a single large room with no separating walls, so the dust from each operation could travel throughout the building. Plaintiff worked in each of these areas of the facility, sometimes three or four times per day. Plaintiff did not use any breathing protective equipment while working for Johns Manville. At the end of the day, Plaintiff's clothes had "a white film of that asbestos on them." After work, Plaintiff and the other workers would use an air hose to blow off their clothes before going home.
Beginning in 1952, Plaintiff worked as a "spare hand," which meant that he performed a variety of tasks in the facility. Plaintiff testified that he became the "supervisor of the whole yarn manufacturing part of the company" in 1957. In that capacity, Plaintiff oversaw between forty-five to eighty employees and spent about ninety percent of his time on the plant floor overseeing the manufacturing process. However, once he began to work as a supervisor, Plaintiff did not have responsibility for performing "hands on" work except for occasionally repairing machinery.
Although Plaintiff stopped working at Johns Manville in August 1968, he was paid through June 1969 as the result of accumulated vacation time and the receipt of nine months severance pay. At that point, he began working at Armour Creameries, a turkey and chicken processing plant. Subsequently, Plaintiff worked at Masterspun Yarn, a carpet yarn plant, and Maylock Industries, a plastic injection molding plant. After working in various industries for several years, Plaintiff began raising turkeys full-time and remained in that occupation from 1986 until 2003, when he was 75. As a turkey grower, Plaintiff would keep approximately eighteen to twenty thousand turkeys at one time.
Plaintiff began smoking cigarettes in 1944, when he was 16 years old, and stopped smoking in 1992, when he was 64. Plaintiff usually smoked a pack a day during the time that he smoked. Plaintiff has had multiple heart catheterizations, including one in 1999, which led to a quadruple bypass procedure, and another one in 2003, shortly before he stopped working as a turkey grower.

II. Procedural History
On 24 May 2005, Plaintiff filed an Industrial Commission Form 18 against Defendants seeking workers compensation benefits for asbestosis. The matter was heard before Deputy Commissioner George T. Glenn, II on 15 November 2006. On 25 February 2008, the Deputy Commissioner entered an Opinion and Award finding that Plaintiff had been exposed to asbestos during his employment with Johns Manville and had developed asbestosis as a result of that exposure. The Deputy Commissioner ordered Defendants to pay disability benefits to Plaintiff from September 2003 until such time as Plaintiff returned to work at the same or greater wages or upon further order of the Commission.
On 26 February 2008, Defendants appealed the Deputy Commissioner's decision to the Commission. On 7 November 2008, the Commission entered an Opinion and Award affirming the Deputy Commissioner's decision. Defendants noted an appeal from the Commission's order to this Court.

III. Standard of Review
The standard of review applied by this Court in workers' compensation cases is well-established. "The Industrial Commission is the fact-finding body." Hendrix v. Linn-Corriher Corp., 317 N.C. 179, 186, 345 S.E.2d 374, 379 (1986) (citing Watkins v. City of Wilmington, 290 N.C. 276, 280, 225 S.E.2d 577, 580 (1976)). "In considering factual issues, the Commission's responsibility is to judge the credibility of the witnesses and the weight to be given to their testimony." Hendrix, 317 N.C. at 186, 345 S.E.2d at 379 (citing Hilliard v. Apex Cabinet Co., 305 N.C. 593, 595, 290 S.E.2d 682, 683-84 (1982)). Our review of a decision of the Industrial Commission is limited to an examination of two issues: "whether there was any competent evidence before the Commission to support its findings of fact and whether the findings of fact justify its legal conclusions and decision." Buchanan v. Mitchell County, 38 N.C. App. 596, 599, 248 S.E.2d 399, 401 (1978), cert. denied, 296 N.C. 583, 254 S.E.2d 35-36 (1979) (citing Inscoe v. Industries, Inc., 292 N.C. 210, 232 S.E.2d 449 (1977)). The Commission's legal conclusions are reviewable by the appellate courts on a de novo basis. Grantham v. R. G. Barry Corp., 127 N.C. App. 529, 534, 491 S.E.2d 678, 681 (1997), disc. review denied, 347 N.C. 671, 500 S.E.2d 86 (1998).

IV. Substantive Legal Analysis
According to N.C. Gen. Stat. § 97-52, an occupational disease as defined in N.C. Gen. Stat. § 97-53 is compensable in the same manner as "the happening of an injury by accident." N.C. Gen. Stat. § 97-53(24) treats "asbestosis" as a compensable occupational disease. As a result, in the event that Plaintiff contracted asbestosis in the course and scope of his employment with Johns Manville and became disabled as a result, he is entitled to benefits under the Workers Compensation Act.

A. Sufficiency of the Evidence of Asbestosis
Defendants contend that the Commission erred by concluding that Plaintiff contracted asbestosis on the grounds that the evidentiary record does not support the Commission's findings of fact or its corresponding legal conclusions to that effect. We disagree.
In its order, after making findings of fact concerning Plaintiff's exposure to asbestos during his employment with Johns Manville that are generally consistent with the factual summary set out above, the Commission made the following findings of fact addressing the medical testimony concerning the extent to which Plaintiff had asbestosis:
17. Dr. [Fred] Umeh is board-certified in pulmonary, critical care, and general medicine. Dr. Umeh began treating Plaintiff in April 2004 on a referral from Plaintiff's family doctor, Dr. Gary Henry for chronic cough and lung problems.
18. Dr. Umeh opined that plaintiff had sufficient exposure to asbestos and sufficient latency to contract asbestosis. After examining Plaintiff, Dr. Umeh found that Plaintiff had bilateral basilar rales which he attributed to asbestosis and asbestos exposure in his deposition:
Q: I'm looking at the April 5th, 2004 note. You diagnosed bilateral basilar rales.
A: Uh-huh (yes).
Q: And what is the significance of those findings as it relates to someone with the disease of asbestosis?
A: It does indicate  this is the most  probably the  a sign you have of pulmonary fibrosis. So it does indicate that you have interstitial lung disease because as the lungs pop open, they'll make that crackly, or what we call rales. And clinically it does support, you know, that he most likely had  that he had pulmonary fibrosis.
Q: Okay. That's indicative of pulmonary fibrosis?
A: Yes.
Q: Which would be  one form of that would be asbestosis?
A: Well, once we have pulmonary fibrosis with a clear historical  you know, history of exposure to asbestos, and also radiological evidence of, you know, asbestos, you know, a lung disease with fibrosis qualifies as asbestosis.
19. Plaintiff was given a pulmonary function test on April 5, 2004, which revealed a lung impairment of a moderate obstructive nature. However, subsequent pulmonary function tests done over time showed that plaintiff also developed a pulmonary restriction. Dr. Umeh testified that the restrictive component of his lung impairment would be characteristic of someone with asbestosis.
20. After a review of plaintiff's CT scans, Dr. Umeh diagnosed Plaintiff with asbestosis and asbestos-related calcified pleural plaques. He testified to a reasonable degree of medical certainty that plaintiff has asbestosis.
21. As a result of his conditions, Plaintiff currently is required to use oxygen 24 hours a day and, even while using oxygen, his oxygen level drops with any type of physical activity. Dr. Umeh opined that Plaintiff's asbestosis plays a significant role in his breathing problems. Dr. Umeh further stated that he does not believe Plaintiff would be able to do any type of physical work. At the time of the hearing, Plaintiff saw Dr. Umeh about every three months.
22. Dr. [Robyn] Stacy-Humphries is a staff radiologist at Union Regional Medical Center. She reviewed the various forms of radiology taken of Plaintiff. She found calcified pleural plaques which she testified were caused by asbestos exposure. She also testified that in 1999, she found signs of chronic interstitial lung disease and by 2005, she found linear scarring or fibrosis in Plaintiff's lungs. One of the possible causes of such conditions is asbestosis.
23. Dr. John Adams, like Dr. Stacy-Humphries, is a staff radiologist at Union Regional Medical Center. Dr. Adams also found linear opacities on plaintiff's radiology, which he said could be caused by asbestosis. Dr. Adams also opined that the pleural plaques seen on plaintiff's radiology showed asbestos exposure.
24. Dr. [Ted] Kunstling was retained by Defendants. Dr. Kunstling agreed that Plaintiff had sufficient exposure to asbestos to develop asbestosis and that he had a sufficient latency to develop asbestosis. Dr. Kunstling found that Mr. Pope suffered from "rales" in the bases of his lungs as well as pleural plaquing. Additionally, he found that Plaintiff suffers from restrictive breathing which is characteristic of an individual suffering from asbestosis. He admitted that these findings are associated with asbestosis.
25. Dr. Kunstling acknowledged that the reason he cannot say Plaintiff has asbestos is because he did not see any pulmonary fibrosis on a CT scan he reviewed of Plaintiff's lungs. Dr. Kunstling stated that Plaintiff may have some very early asbestosis not appreciable on a CT scan, but a lung biopsy would probably reveal some pathological findings.
26. Dr. [Phillip C.] Goodman was retained by Defendants to review a series of radiological films. Dr. Goodman agreed that Plaintiff has asbestos-related pleural plaques. Dr. Goodman added that Plaintiff's April 2004 CT scan showed "heterogeneous linear lung opacities" which is one way in which asbestosis might present on a high-resolution CT scan. Dr. Goodman agreed that it was possible that plaintiff had asbestosis.
27. Dr. Jill Ohar examined Plaintiff on May 30, 2007. Dr. Ohar is board-certified in pulmonary, critical care, and internal medicine. Since 2002, she has been a teaching professor at the Wake Forest School of Medicine. She has published numerous articles relating [to] asbestos[-related] lung diseases. Based upon her review of the pulmonary function testing, Dr. Ohar concluded that Plaintiff suffered from a restrictive breathing impairment, which would be characteristic of someone with asbestosis. Dr. Ohar opined that [Plaintiff] suffered from both pulmonary asbestosis and asbestos-related pleural disease.
28. Dr. Umeh's testimony is given greater weight than Dr. Kunstling's testimony. Even if Dr. Ohar's testimony were not considered pursuant to defendants' objection, the greater weight of the competent evidence showed that plaintiff contracted asbestosis and asbestos-related pleural plaques.
29. The greater weight of the competent evidence establishes that plaintiff was exposed to the hazards of asbestosis while employed by Defendant-Employer. The credible testimony from plaintiff established that he had greater asbestos exposure at defendant-employer than does the public generally. No evidence was submitted showing that plaintiff was injuriously exposed to the hazards of asbestosis in any subsequent employment.
30. The Full Commission finds that plaintiff developed asbestosis as a result of his employment with Defendant-Employer.
31. The greater weight of the competent evidence establishes that plaintiff stopped working due to breathing problems and that his asbestosis was a significant factor in his breathing problems.
After thoroughly reviewing the record, we find that the Commission found as a fact that Plaintiff had contracted asbestosis as a result of exposure to asbestos which occurred during his employment with Johns Manville and that the Commission's findings of fact to this effect are amply supported by the evidentiary record.
Dr. Kunstling testified that Plaintiff had sufficient exposure and latency to develop the disease of asbestosis and that Plaintiff suffers from "rales," "pleural plaques," and restrictive breathing, all of which are characteristic of individuals suffering from asbestosis. Dr. Kunstling also testified that:
[T]he pleural plaque is a fairly specific finding associated with asbestos exposure that reflects a duration of time. This is something that can occur in the absence of asbestosis, but is fairly specific for asbestos exposure. So I think the fact that he has had pleural plaque along with a history supports a diagnosis of some degree of asbestos-related lung disease.
However, Dr. Kunstling did not diagnose Plaintiff with asbestosis because he did not see any pulmonary fibrosis on a CT scan he reviewed of Plaintiff's lungs.
Dr. Umeh testified that Plaintiff had sufficient exposure to asbestos and sufficient latency to cause asbestosis; that Plaintiff had bilateral basilar rales, which are indicative of pulmonary fibrosis; that Plaintiff had pulmonary restriction and obstruction, which "confirms" that "he has pulmonary fibrosis;" that Plaintiff had symptoms consistent with "pulmonary fibrosis . . . from asbestosis;" and that Plaintiff had calcified pleural plaques, which are "usually from asbestos exposure." Dr. Umeh further stated that "I have to . . . look at the whole profile of his symptoms, my physical findings, his history in regards to occupational exposures and other information . . . putting them all together" and that, "[b]ased on everything, yes, I still felt he had . . . asbestosis." When asked directly whether Plaintiff's symptoms "wouldn't be definitive of asbestosis, would [they]," Dr. Umeh answered, "the way it stands now, it's definitely asbestosis."
Dr. Stacy-Humphries reviewed a CT scan of Plaintiff's lungs. According to Dr. Stacy-Humphries, Plaintiff had "calcified pleural plaques," which are "associated with asbestos exposure." Dr. Stacy-Humphries explained that:
[F]rom the chest x-ray, the calcified pleural plaques in this gentleman's case . . . are pathognomonic of asbestos exposure. There is really nothing else that could have caused that. In some cases, calcified pleural plaques are associated with hemothorax. In this gentleman's case, the plaques were along the rib margins, extensive calcification on the diaphragm and it's bilateral and symmetric so there really is nothing else that could cause that.
Dr. Adams, a staff radiologist at Union Regional Medical Center, testified that "the calcified pleural plaques . . . are fairly reliably . . . characteristic, what we call pathognomonic[,] for asbestos exposure." Dr. Adams further stated that, "when you see a pattern like we've seen with [Plaintiff], you say yes this is consistent with previous asbestos exposure." Although Dr. Adams stated that, as a radiologist, he does not make diagnoses, when asked, "if Dr. Umeh diagnosed this individual with asbestosis, would you have any reason to disagree with Dr. Umeh," Dr. Adams responded, "No[;] [h]e's a great doctor[;] I have very . . . full confidence in him." Similarly, Dr. Goodman, another radiologist, stated that "[m]y impression for that set of films (lateral chest film) was asbestos-related pleural disease" and that Plaintiff had pleural plaques which he was "fairly certain were caused by exposure to asbestos."
Finally, Dr. Ohar reviewed Plaintiff's radiological results and determined that Plaintiff suffered from two distinct asbestos-related illnesses: pulmonary asbestosis and asbestos-related pleural disease. Dr. Ohar also concluded that Plaintiff suffered from restrictive breathing impairment. Dr. Ohar stated that, "not only the calcified plaques, but the pleural effusion and the bilateral fibrotic changes all are consistent with asbestos exposure[;] [c]alcified pleural plaques . . . especially when found bilaterally, can only be due, for the most part, to asbestos exposure." Dr. Ohar concluded, "I think there is significant pulmonary fibrosis or asbestosis."
As we have previously stated, "[t]he Commission is the sole judge of the credibility of the witnesses, and of the weight to be given to their testimony[;] . . . it may accept or reject the testimony of a witness . . . in whole or in part." Blankley v. White Swan Uniform Rentals, 107 N.C. App. 751, 754, 421 S.E.2d 603, 604 (1992), disc. review denied, 333 N.C. 461, 427 S.E.2d 618 (1993) (citation omitted). "It is not the function of an appellate court to weigh the evidence[,]" so that, "[i]nasmuch as the findings of fact of the Full Commission are supported by legal evidence, they cannot be disturbed." Blankley, 107 N.C. App. at 754, 421 S.E.2d at 605. After a careful study of the evidentiary record, we conclude that the evidence described above provides sufficient support for the Commission's determination that Plaintiff suffered from asbestosis. Buchanan, 38 N.C. App. at 599, 248 S.E.2d at 401; see also Richardson v. Maxim Healthcare/Allegis Grp., 362 N.C. 657, 664, 669 S.E.2d 582, 587 (2008) (stating that "[b]ecause [the findings] are supported by competent evidence .. . these findings are conclusive[,]" and that the "findings in turn support [the Full Commission's] conclusions").
The undisputed evidence in the record indicated that the source of Plaintiff's exposure to asbestos was his employment at Johns Manville. All of the medical experts appear to have been of the opinion that Plaintiff's exposure was sufficient in degree and had occurred sufficiently long ago to have caused Plaintiff to have developed asbestosis by the time that he sought benefits under the Workers Compensation Act. Both Dr. Umeh and Dr. Ohar explicitly diagnosed Plaintiff as suffering from asbestosis. This testimony, without more, suffices to support the Commission's determination that Plaintiff suffered from asbestosis as a result of exposure that occurred during his employment at Johns Manville. Defendants dispute this conclusion by arguing that the Commission should not have considered Dr. Ohar's testimony for procedural reasons and that Dr. Umeh did not definitively diagnose Plaintiff as suffering from asbestosis. For the reasons discussed in more detail in the next section of this opinion, we conclude that the Commission did not commit an error of law in considering Dr. Ohar's testimony. In addition, while the record does reflect that Dr. Umeh indicated that he diagnosed Plaintiff on 5 April 2004 as having "pulmonary fibrosis possibly due to asbestosis," he confirmed this diagnosis with additional testing, including a high resolution CT scan. As a result, Dr. Umeh ultimately concluded that Plaintiff definitely suffered from asbestosis.[2] Thus, the record clearly supports the Commission's finding that Plaintiff had contracted asbestosis.

B. Consideration of the Testimony of Dr. Ohar
Next, Defendants contend that the Commission abused its discretion by considering the testimony of Dr. Ohar despite the fact that Plaintiff failed to identify her as an expert witness prior to or during the hearing and also failed to include her in the list of expert witnesses contained in the pre-trial agreement. We do not find Defendants' argument persuasive.
On 15 November 2006, Plaintiff's claim came on for hearing before the Deputy Commissioner. At or prior to the commencement of the hearing before the Deputy Commissioner, Defendants requested that they be allowed to conduct an independent medical examination of Plaintiff pursuant to N.C. Gen. Stat. § 97-27.[3] The Deputy Commissioner allowed Defendant's request for an independent medical examination by means of a written order entered 12 December 2006. On 21 March 2007, Plaintiff underwent an independent medical examination by Dr. Kunstling. Defendants produced Dr. Kunstling's report in May 2007. After the production of Dr. Kunstling's report, Plaintiff requested "to add [Dr. Ohar] to the witness list and her report as a proposed exhibit." Plaintiff described Dr. Ohar as a "rebuttal expert." The Deputy Commissioner allowed Plaintiff's request by means of a written order entered 28 June 2007, with this decision conditioned on the understanding that "the parties shall have the right to take the deposition of [Dr. Ohar]." Both the Deputy Commissioner and the Full Commission considered Dr. Kunstling's and Dr. Ohar's depositions in deciding whether Plaintiff was entitled to compensation.
The Industrial Commission is an administrative board, with quasi-judicial functions. The manner in which it transacts its business is a proper subject of statutory regulation and need not necessarily conform to court procedure except where the statute so requires, or where, in harmony with the statute, or where it fails to speak, the Court of last resort, in order to preserve the essentials of justice and the principles of due process of law, shall consider rules similar to those observed in strictly judicial investigations in courts of law to be indispensable or proper. . . . Under these conditions we might expect a liberal treatment by the courts of the procedure adopted by the Commission with respect to the reception and consideration of evidence upon a claim in "dispute."
Maley v. Thomasville Furniture Co., 214 N.C. 589, 594, 200 S.E. 438, 441 (1938). N.C. Gen. Stat. § 97-80 authorizes the Commission to make rules for carrying out the provisions of the Workers Compensation Act, and requires processes and procedures to be summary and simple. N.C. Gen. Stat. § 97-80.
In most workers compensation cases involving the consideration of new evidence at a relatively late stage in the process, the new evidence is taken when the case is before the Full Commission after the matter has been heard and decided by the Deputy Commissioner. In such cases, "the question of whether to reopen a case for the taking of additional evidence is addressed to the sound discretion of the Commission, and its decision is not reviewable on appeal in the absence of a manifest abuse of that discretion." Pickrell v. Motor Convoy, Inc., 82 N.C. App. 238, 243-44, 346 S.E.2d 164, 168 (1986), rev'd on other grounds, 322 N.C. 363, 368 S.E.2d 582 (1988); see also Allen v. Roberts Elec. Contrs., 143 N.C. App. 55, 66, 546 S.E.2d 133, 141 (2001). In this instance, the Deputy Commissioner allowed the taking of further evidence after the conclusion of the hearing and the completion of the independent medical evaluation requested by Defendants, which both the Deputy Commissioner and the Full Commission considered in deciding the issues raised by Plaintiff's request for workers compensation benefits. N.C. Gen. Stat. § 97-79(b) grants deputy commissioners the same authority that is granted to members of the Commission by virtue of N.C. Gen. Stat. § 97-80. As a result, the ultimate issue raised by Defendants' challenge to the Deputy Commissioner's decision to allow Plaintiff's motion to add Dr. Ohar to the witness list and treat her report as an exhibit, and the Commission's decision not to overturn the Deputy Commissioner's decision, is whether those decisions constituted an abuse of discretion.
According to N.C. Gen. Stat. § 97-27:
(a) After an injury, and so long as he claims compensation, the employee, if so requested by his employer or ordered by the Industrial Commission, shall, subject to the provisions of subsection (b), submit himself to examination, at reasonable times and places, by a duly qualified physician or surgeon designated and paid by the employer or the Industrial Commission. . . .
(b) In those cases arising under this Article in which there is a question as to the percentage of permanent disability suffered by an employee, if any employee, required to submit to a physical examination under the provisions of subsection (a) is dissatisfied with such examination or the report thereof, he shall be entitled to have another examination by a duly qualified physician or surgeon licensed and practicing in North Carolina or by a duly qualified physician or surgeon . . . .
Thus, N.C. Gen. Stat. § 97-27(b) clearly allows a plaintiff in cases in which "the percentage of permanent disability suffered by an employee" is in dispute who "is dissatisfied with [an] examination or. . . report" resulting from an independent medical evaluation "to have another examination by a duly qualified physician or surgeon." N.C. Gen. Stat. § 97-27(b). Although it is not clear whether "a question as to the percentage of permanent disability" existed in this case, we believe that N.C. Gen. Stat. § 97-27(b) suggests that the General Assembly recognized that a plaintiff might well wish to rebut an independent medical examination procured by a defendant in a workers' compensation proceeding. Based upon our examination of the record, it does not appear to us that anything more than that occurred in this instance.
The ultimate effect of the Deputy Commissioner's orders was to allow the Defendants to procure an independent medical examination by Dr. Kunstling and to allow Plaintiff to procure rebuttal evidence from Dr. Ohar. Perhaps not surprisingly, Dr. Kunstling opined that Plaintiff did not have asbestosis, while Dr. Ohar opined that he did. Ultimately, the Commission found the facts in accordance with the position espoused by Dr. Ohar. Although Defendants vigorously contend that they were prejudiced by the procedures authorized by the Deputy Commissioner's rulings, we are not persuaded that this was the case.
Under the Deputy Commissioner's order, the Defendants were authorized to take, and did in fact take, the deposition of Dr. Ohar. In addition, Defendants could have submitted a motion to the Deputy Commissioner or the Commission for the taking of additional evidence for the purpose of rebutting Dr. Ohar, see Pickrell, 82 N.C. App. at 243-44, 346 S.E.2d at 168, but did not do so. Since Defendants were able to submit evidence after the initial hearing as a result of their independent medical evaluation, to cross-examine Dr. Ohar, and to request the admission of additional evidence even after cross-examining Dr. Ohar, we cannot see how the procedures employed by the Deputy Commissioner and allowed to remain undisturbed by the Commission constituted "a manifest abuse of . . . discretion." Id. Although Defendants argue that these procedures had the effect of allowing Plaintiff to use a witness who was not identified prior to or during the hearing, that Plaintiff had an ample opportunity to identify a rebuttal witness at an earlier time, that Plaintiff's motion to add Dr. Ohar as a rebuttal witness contained numerous inaccuracies[4], and that allowing the use of Dr. Ohar as a witness undermined the importance of the parties' pretrial agreement, each of these arguments amounts to an insistence on the importance of rules and procedures that are intended to provide adequate notice of the evidence upon which the other party intends to rely, an issue which the Deputy Commissioner attempted to address using other means.[5] Had Plaintiff acted in one of the ways that Defendants suggest, such as by listing an unidentified "rebuttal expert" in the Pretrial Agreement, it is difficult for us to see how Defendants would have been in a better position than they were under the Deputy Commissioner's order. Thus, on the basis of the present record, we are unable to say that the approach taken by the Deputy Commissioner and upheld by the Commission was an unreasonable one. Furthermore, given the Commission's finding that, "[e]ven if Dr. Ohar's testimony were not considered pursuant to defendants' objection, the greater weight of the competent evidence showed that plaintiff contracted asbestosis," we conclude that any error committed by the Deputy Commissioner and the Commission in allowing the consideration of Dr. Ohar's testimony did not prejudice Defendants. As a result, Defendants are not entitled to relief on appeal as a result of the inclusion of Dr. Ohar's testimony in the record.

C. Disability
Thirdly, Defendants contend that the Commission erred by concluding that Plaintiff is disabled. Specifically, Defendants argue that "Plaintiff is unable to establish disability . . . because when he stopped working in 2003, he had not been diagnosed with asbestosis, nor had any physician instructed him to stop working[;] [t]herefore, at that time, his alleged incapacity to work could not have been caused by asbestosis because he had not developed it." After careful consideration of Defendants' contentions, we conclude that the Commission did not commit an error of law by finding that Plaintiff was eligible to receive workers compensation benefits.
In order to obtain compensation under the Workers' Compensation Act, the claimant has the burden of proving the existence and extent of his disability. Hilliard, 305 N.C. at 595, 290 S.E.2d at 683. "The slow development, incurable nature, and usual permanence of the disability resulting from asbestosis and silicosis were pointed to in Honeycutt v. Asbestos Co., 235 N.C. 471, 70 S.E.2d 426 91952), as reasons prompting the Legislature to draw distinctions between the tests for compensation to be paid to an injured employee and a diseased employee suffering from silicosis." Pitman v. Carpenter, 247 N.C. 63, 67, 100 S.E.2d 231, 234 (1957).
An employee does not contract or develop asbestosis or silicosis in a few weeks or months. These diseases develop as the result of exposure for many years to asbestos dust or dust of silica. Both diseases, according to the textbook writers, are incurable and usually result in total permanent disability.
Honeycutt, 235 N.C. AT 476-77, 70 S.E.2d at 430 (citation omitted).
N.C. Gen. Stat. § 97-55 defines "disability" for occupational diseases as "the state of being incapacitated as the term is used in defining `disablement' in [N.C. Gen. Stat. §] 97-54." N.C. Gen. Stat. § 97-54 provides:
The term "disablement" as used in this Article as applied to cases of asbestosis and silicosis means the event of becoming actually incapacitated because of asbestosis or silicosis to earn, in the same or any other employment, the wages which the employee was receiving at the time of his last injurious exposure to asbestosis or silicosis; but in all other cases of occupational disease "disablement" shall be equivalent to "disability" as defined in [N.C. Gen. Stat. §] 97-2(9).
N.C. Gen. Stat. § 97-54.
[T]here is a radical difference between the criterion of disability in cases of asbestosis and silicosis and that of disability in cases of injuries and other occupational diseases. An employee is disabled by injury or an ordinary occupational disease within the purview of the Workmen's Compensation Act only if he suffers incapacity because of the injury or disease to earn the wages which he was receiving at the time of the injury or disease in the same or any other employment. [N.C. Gen. Stat. §] 97-2. But a worker is disabled in cases of asbestosis or silicosis if he is "actually incapacitated, because of such occupational disease, from performing normal labor in the last occupation in which remuneratively employed." [N.C. Gen. Stat. §] 97-54.
Young v. Whitehall Co., 229 N.C. 360, 365-66, 49 S.E.2d 797, 801 (1948).
"`[W]hether an employee is disabled [for purposes of workers' compensation] is a question of law.'" Estate of Gainey v. Southern Flooring & Acoustical Co., 184 N.C. App. 497, 503, 646 S.E.2d 604, 608 (2007) (quoting Heffner v. Cone Mills Corp., 83 N.C. App. 84, 87, 349 S.E.2d 70, 73 (1986)). In order to support a conclusion that a claimant is totally and permanently disabled by exposure to asbestos and entitled to benefits under N.C. Gen. Stat. § 97-29, the Commission must find that the claimant is totally unable, "as a result of the injury arising out of and in the course of his employment," Frazier v. McDonald's, 149 N.C. App. 745, 752, 562 S.E.2d 295, 300 (2002), cert. denied, 356 N.C. 670, 577 S.E.2d 117 (2003) (citation omitted), "to earn, in the same or any other employment, the wages which the employee was receiving at the time of his last injurious exposure to asbestosis or silicosis." N.C. Gen. Stat. § 97-54 (2005); see also Abernathy v. Sandoz Chems./Clariant Corp., 151 N.C. App. 252, 257, 565 S.E.2d 218, 221, cert. denied and disc. review denied, 356 N.C. 432, 572 S.E.2d 421 (2002) (stating that "[d]isablement from asbestosis is defined as `the event of becoming actually incapacitated because of asbestosis . . . to earn, in the same or any other employment, the wages which the employee was receiving at the time of his last injurious exposure to asbestosis'") (citing N.C. Gen. Stat. § 97-54)). Furthermore, in Roberts v. Southeastern Magnesia and Asbestos Co., 61 N.C. App. 706, 710-11, 301 S.E.2d 742, 744 (1983), this Court stated that "[i]t is clear from the language of [N.C. Gen. Stat. § 97-61.5(b) and N.C. Gen. Stat. § 97-61.7] that a diagnosis of asbestosis . . . is the equivalent of a finding of actual disability."
In Estate of Gainey, this Court concluded that:
The Commission's findings that (1) plaintiff had received medical treatment for asbestosis-related problems; (2) plaintiff suffered from breathing problems as a result of asbestosis; (3) plaintiff had suffered from asbestosis as a result of his employment with defendant-employer and the disease had rendered him unable to perform gainful employment since 3 December 1999; (4) plaintiff's breathing problems severely impaired his daily activities; and (5) as a result of asbestosis, it was difficult, if not impossible, for plaintiff to do any job that required any amount of physical activity were sufficient to support the Commission's conclusion that plaintiff was totally and permanently disabled, and entitled to benefits under N.C. Gen. Stat. § 97-29 starting 3 December 1999.
Estate of Gainey, 184 N.C. App. at 503-04, 646 S.E.2d at 608. The Court reached this conclusion despite the fact that the plaintiff had retired in 1995 and the fact that his "retirement was in no way related to any medical problem." Id., at 184 N.C. App. at 502, 646 S.E.2d at 607; see also McKee v. Spinning Company, 54 N.C. App. 558, 564, 284 S.E.2d 175, 179 (1981), disc. review denied, 305 N.C. 301, 291 S.E.2d 150 (1982) (stating that the appropriate time to "comput[e] plaintiff's compensation [was] 22 December 1971, the day he quit working[,]" notwithstanding the fact that the plaintiff was not diagnosed with "severe obstructive lung disease causing a substantial reduction in lung capacity" until August 1978).
In this case, Plaintiff stopped working as a turkey farmer in September 2003, when he was 75. When asked "what role did your breathing play, if any, in your decision to stop turkey farming," Plaintiff answered:
Well, along there at the last, it just got to where I just couldn't get through the houses. It was just a  it was just a task to . . . walk through there. You'd have to walk them twice a day, and they're four hundred foot long, so you're walking a pretty good distance. . . . I just didn't have enough breath to keep doing that.
When asked, "aside from the difficulties walking through the turkey house and the work, has your breathing had any other effect on your life," Plaintiff responded:
Well, yes. It slows down everything that you do. . . . Well, now toting this oxygen is a  gets to be a big job. It don't look like much now when you pick it up one time but it  if you carry that ten to twelve pounds all day long, it gets to be a heap of weight.
Plaintiff testified that he had been on oxygen for eight months. Dr. Umeh also explained why Plaintiff was incapable of working:
Q: . . . [D]o you have an opinion if he should have maintained that job as a poultry farmer, if he could maintain that job?
A: I mean, currently he has to wear oxygen 24 hours and that would be very difficult. I mean, it's like he maintains normal saturation at rest with the oxygen, but once he increases his, you know, activity, his oxygen level drops. And I don't think he will be able to.
Q: To do any type of physical work?
A: Yeah, [no] degree of physical work[.]
The Commission made the following findings of fact relating to the extent of Plaintiff's disability and its relationship to his asbestosis:
1. Plaintiff is 80 years old. . . . As a result of breathing problems, Plaintiff stopped working in September 2003.
. . . .
20. After a review of plaintiff's CT scans, Dr. Umeh diagnosed Plaintiff with asbestosis and asbestos-related calcified pleural plaques[.]
. . . .
21. As a result of his conditions, Plaintiff currently is required to use oxygen 24 hours a day and, even while using oxygen, his oxygen level drops with any type of physical activity. Dr. Umeh opined that Plaintiff's asbestosis plays a significant role in his breathing problems. Dr. Umeh further stated that he does not believe Plaintiff would be able to do any type of physical work[.]
. . . .
31. The greater weight of the competent evidence establishes that plaintiff stopped working due to breathing problems and that his asbestosis was a significant factor in his breathing problems.
Based on the foregoing findings of fact, the Full Commission concluded:
1. Plaintiff was exposed to the hazards of asbestos during his employment with defendant-employer, which subsequently led to plaintiff contracting asbestosis. Plaintiff's asbestosis is an occupational disease due to causes and conditions characteristic of and peculiar to his employment with defendant-employer, and which is not an ordinary disease of life to which the general public is equally exposed. N.C. Gen. Stat. 97-53(24).
2. Plaintiff's asbestosis was a significant contributing factor to his becoming disabled in September 2003. N.C. Gen. Stat. 9 97-2(9).
We see no substantive difference between the Commission's findings and conclusions of this case and those in Estate of Gainey. The Commission's findings of fact are supported by competent evidence and are sufficient to support the Commission's conclusion that plaintiff was totally and permanently disabled and entitled to benefits under N.C. Gen. Stat. § 97-29 starting in September 2003. As a result, we conclude that the Commission did not err in finding that Plaintiff was disabled and eligible to receive workers compensation benefits as a result of his asbestosis.

D. Weekly Compensation Rate
Finally, Defendants contend that the Commission erred in calculating the weekly compensation rate which Plaintiff should receive. More specifically, Defendants argue that the Commission erred by basing Plaintiff's average weekly wage on his 2003 earnings rather than his earnings during 1967, which was when his "last injurious exposure" to asbestos occurred. In addition, Defendants argue that the Commission erred by basing Plaintiff's compensation rate on his earnings in 2003 because Plaintiff had not developed asbestosis by 2003; because, "[a]t the time of the alleged `diagnosis,' Plaintiff's wages were zero;" and because his diagnosis occurred at a time when he had already retired, he had sustained no loss of earning capacity. We find these arguments unpersuasive.
The essential argument advanced by Defendants has already been addressed by this Court in Abernathy, 151 N.C. App. at 257-59, 565 S.E.2d at 222, and Moore v. Standard Mineral Co., 122 N.C. App. 375, 469 S.E.2d 594 (1996). In Moore, this Court explicitly rejected the proposition that the plaintiff's "rate of compensation should be based upon the wages he was earning at the time" he left his employment with defendant, stating that this approach "ignores the context within which [N.C. Gen. Stat.] § 97-61.5 was adopted." Id., 122 N.C. App. at 377, 469 S.E.2d at 596. The Moore Court held that the proper date for determining the plaintiff's average weekly wage under N.C. Gen. Stat. § 97-61.5 was the time of injury, which was deemed to be the date upon which the plaintiff was diagnosed as suffering from silicosis or asbestosis. Id., 122 N.C. App. at 379, 469 S.E.2d at 597. However, in Abernathy, 151 N.C. App. at 258, 565 S.E.2d at 222, this Court stated that "the holding in Moore, that the average weekly wage is computed as of the date of diagnosis, is not applicable to the case before us since plaintiff in the present case was no longer employed in any capacity at the time he was diagnosed with asbestosis." As a result:
Under the general provisions of the Workers' Compensation Act, [N.C. Gen. Stat.] § 97-2(5) "provides a hierarchy" of five methods for computing average weekly wages. McAninch v. Buncombe County Schools, 347 N.C. 126, 130, 489 S.E.2d 375, 378 (1997). The final method, contained in the second full paragraph of [N.C. Gen. Stat.] § 97-2(5) provides:
But where for exceptional reasons the foregoing would be unfair, either to the employer or employee, such other method of computing average weekly wages may be resorted to as will most nearly approximate the amount which the injured employee would be earning were it not for the injury.
N.C. Gen. Stat. § 97-2(5). This final method "may not be used unless there has been a finding that unjust results would occur by using the previously enumerated methods." McAninch, 347 N.C. at 130, 489 S.E.2d at 378 (citation omitted).
In the present case, it would be obviously unfair to calculate plaintiff's benefits based on his income upon the date of diagnosis because he was no longer employed and was not earning an income. And, since the General Assembly has made no specific provision for determining compensation pursuant to [N.C. Gen. Stat.] § 97-64 when a former employee is diagnosed with asbestosis some time after his removal from the employment, the only statutory provision which may in fairness be used is the method recited above. Plaintiff testified that he retired from defendant company in 1993 because he "wasn't up to par" and "couldn't keep up" in his job duties. He also stated he would have liked to keep working until he was 65 but his "health wasn't that good." Because plaintiff contracted asbestosis by working around asbestos for 25 years at defendant employer, the only fair method for determining his average weekly wage is using his latest full year of employment with defendant company, which appears to be the same figure the deputy commissioner and the Full Commission used in their calculations of plaintiff's average weekly wage.
Abernathy, 151 N.C. App. at 258, 565 S.E.2d at 222. Abernathy and Moore are controlling in this case. Moore holds that the average weekly wage of a plaintiff for the purpose of determining benefits under N.C. Gen. Stat. § 97-61.5 was the wage earned by the plaintiff as of the time of injury. Abernathy extends the ruling of Moore by stating that "it would be obviously unfair to calculate plaintiff's benefits based on his income upon the date of diagnosis because he was no longer employed and was not earning an income" so that "the only fair method for determining his average weekly wage is using his latest full year of employment." Id., 151 N.C. App. at 259, 565 S.E.2d at 222. In this case, Plaintiff was unemployed and earning no salary at the time of his diagnosis. Given that Plaintiff was not earning any income at the time of his diagnosis, the Full Commission followed the approach approved in Abernathy and calculated a weekly compensation rate of $399.06 based on the wages that Plaintiff earned during his last full year of employment. Defendants have completely failed to explain why the approach adopted by the Commission is not appropriate under Abernathy or why Abernathy should not be deemed controlling in this instance. As a result, the Full Commission did not err in the manner in which it calculated Plaintiff's weekly compensation rate, since it followed an approach that has clearly been found to be appropriate in this Court's previous decisions.

Conclusion
Thus, for the reasons set forth above, we find no error in the proceedings before the Commission or in the Commission's order. As a result, the Commission's order should be, and hereby is, affirmed.
AFFIRMED.
Judges GEER and STROUD concur.
Report per Rule 30(e).
NOTES
[1] Occasionally, rayon would be used instead of cotton.
[2] Defendants also argue that, having alleged in his Form 18 that he had been diagnosed with asbestosis as of 5 April 2004, Plaintiff could not rely on any evidence that he had contracted asbestosis other than "the April 5, 2004 note from Dr. Umeh which did not contain a valid diagnosis." Defendants have not, however, cited any authority which limits the evidence upon which Plaintiff is entitled to rely to evidence that existed at the time of the filing of the Form 18, and we know of none.
[3] The record is not entirely clear as to the exact time at which the request for an independent medical examination of Plaintiff was made. The Pretrial Agreement lists Defendants' "IME Physician" as a potential witness. Defendants contend in their brief that they filed a written motion for an independent medical examination on 7 November 2007 and the Deputy Commissioner's order granting Defendants' request is certainly susceptible to the interpretation that such a written motion was filed; however, no such written motion appears in the record on appeal.
[4] Although Defendants contend that Plaintiff incorrectly claimed that Defendants' request for an independent medical examination was made prior to, rather than at the time of, the 15 November 2006 hearing, Defendants did not include their written motion for an independent medical examination in the record on appeal. In addition, we are unable to ascertain why an error of this nature necessitates a denial of Plaintiff's motion given that all parties agree that the Deputy Commissioner did not order the independent medical examination until 12 December 2006. Defendants' remaining factual challenges to Plaintiffs' motion appear to be directed more at the validity of the inferences drawn in Plaintiffs' motion than at the validity of Plaintiff's factual statements.
[5] Defendants also rely on the decision of this Court in Wade v. Carolina Brush Mfg. Co., 187 N.C. App. 245, 652 S.E.2d 713 (2007) (holding that the Commission abused its discretion by waiving rules requiring the filing of a statement of the grounds for an appeal in a case involving an appeal by a pro se plaintiff from an order entered by a deputy commissioner to the Commission). However, given the mandatory nature of the rule at issue in Carolina Brush, we do not believe that our decision in that case is particularly relevant to our consideration of the discretionary decision at issue here.